<u>**Statement of the Case**</u>

Eastern District of New York Indictment No. 03-Cr 412 (NG) charged defendant Numan Muflahi with: false statements in violation of **18 U.S.C.A. § 1001** (Count One). Defendant entered a plea of not guilty to the offense set forth in the indictment. Trial commenced on February 9, 2004 before the Honorable Nina Gershon, U.S.D.J., and a jury. On February 18, 2004 the jury returned a verdict of guilty. On July 9, 2004 Judge Gershon imposed a 5 year period of imprisonment on defendant.

Final Judgment was entered on July 9, 2004 Notice of Appeal was filed on July 19, 2004. On June 6, 2005 the Second Circuit remanded.

<u>**Statement of Facts**</u>

**A. The United States' Proofs**

**I.**
**The Investigation At Issue**

**i. Background**

**a. Brian Murphy**

Brian Murphy has been employed by the Federal Bureau of Investigation for six years. At the time of the trial herein, Murphy was assigned to a squad denominated as IT-1. That acronym describes a unit focused upon "international terrorism." Murphy was initially assigned to this anti-

1

terrorism unit in September of 2001. Prior thereto, Murphy was "in a narcotics group."

The basic International Terrorist Squad, in which Murphy functions, is divided into two groups. One of those two groups primarily investigates international terrorism and the other domestic terrorism. Murphy testified:

> The domestic terrorism [unit] pursues groups of individuals based in the United States or [who] receive direction or funding from within the United States. The international terrorist units investigate groups and individuals that receive their funding and direction from countries outside the United States.

Murphy's individual duties and responsibilities as an agent of the IT Squad are "to investigate crimes and [information associated] with terrorist matters."

Murphy testified as to the particular significance of money acquisition and financing to groups involved in alleged terrorist activities. With regard to investigations related thereto, Murphy inartfully stated "It's going to lead you to the terrorist that may or may not attack us...[and] stop the assets that the terrorist will have, which is money."[1]. Murphy further stated that the

---

[1] A theme of concern in this matter stemmed from repeated references to the acts and consequences of terrorism. These factors were adduced despite the fact that the organization and individuals under investigation were not designated as

investigation of funding in relation to terrorist organizations is directed toward "who gives them money within the United States or around the world, where they get it from, and where they send it to."

The specific designation as an "international terrorist organization" emanates from "the State Department and the Office of Foreign Asset Control, as well as other groups [which] publish a list of designated persons and [terrorist] organizations."[2]. According to Murphy, funds are raised for the benefit of suspected terrorist organizations either by direct donations or through disguised donations to compromised charities. "Front organizations" are also utilized. Specifically, Murphy testified that certain persons and/or entities which appear to be involved in lawful activity are in reality pursuing unlawful activity intended to raise funds for terrorists.

To make proper investigatory determinations, Murphy gathers "financial forgeries, bank accounts...tax returns [and] other financial documents" for analysis. Murphy also recruits informants to cooperate and infiltrate the

_____

terrorists by any government agency during and/or after trial. The United States substantially capitalized on the hysteria element.

[2] That designation is essentially notice to the public that business dealings and/or contributions to such an organization are illegal. As is discussed **infra,** defendant was not on notice as to any person or entity at issue.

"charities or [front] organizations." Informants and infiltrators employed by Murphy are not permitted to engage in the actual fundraising or to forward funds to suspected terrorists.

When successful fundraising efforts are accomplished by sympathizers or complicit persons, the funds will ordinarily be transferred to suspect organizations by wire transfers to shell businesses and charities. Couriers are also utilized for this purpose. Couriers deliver actual cash or other forms of negotiable instruments directly to the suspected persons and entities.

### ii. The So-Called Black Bear Investigation

### 1. The Regional Focus

The Black Bear Investigation focused on " a group of men [from] Yemen [who] were living in the United States, primarily in the New York area". According to Murphy, these men operated "several front companies in Brooklyn" and were allegedly engaged in "transferring monies from the United States to Yemen." Murphy termed the specific process of money gathering by this group as "Hawla". He stated:

> The [Hawla network] accepted money
> from people that wanted to transfer
> money. They would launder the money
> through their businesses and put the
> money into the business accounts to
> further launder the money that they
> were taking in. Once they laundered

4

> the money enough...they [would]
> provide the money to a courier [who]
> would bring it to their partner over
> in Yemen and distribute the money.
> They would also transfer the money
> with checks or in some other form
> through banking means...The Hawla
> business does not keep any of those
> business records that are [required to
> be] provided to the government, so it
> allows terrorists...to transfer money
> covertly.

Murphy testified that former members of the so-called Hawla network commenced cooperating and "infiltrated the [Yemeni] organization." Murphy also "obtained the bank accounts as well as other financial information for the persons involved in the investigation." In addition, he "relied heavily on [visual and electronic] surveillance." Fifteen persons were ultimately arrested and charged with illegal money transfers.

## 2. Sheikh Mohamed Al-Moayad

Information provided to Murphy from a confidential informant resulted in an investigatory focus upon Sheikh Mohammed Al-Moayad. Al-Moayad previously resided in the capital of Yemen, Sana'a. This particular investigation of Al-Moayad commenced in December of 2001. Murphy's confidential informant had alleged that Al-Moyad was involved in "the recruitment of personnel, the purchase of weapons and the raising of funds". Murphy testified:

> The purpose of the procurement of weapons, the funds and the recruitment of personnel was to provide material, personnel, and money to support various Jihads that are taking place against Western countries. [3]

The informant further advised Murphy that Al-Moayad "was in charge of a charity in Yemen that he used to mask what he was doing with the money".

A sting operation was thereafter initiated wherein Al-Moayad was lured to Frankfurt, Germany by the informant. Al-Moayad traveled to Germany believing that his purpose was to accept tender of a charitable contribution. Al-Moayad was arrested; charged with various offenses, and extradited to the United States.

Murphy testified that prior to his arrest Al-Moayad provided to the informant names and phone numbers of certain persons who resided in the United States. These

---

[3] Murphy defined Jihad as a "Holy War, religious war, [a] struggle against those who oppose Muslims." Injection of this concept into the trial was a further example of the United States' effort to capitalize on a prejudicial miasma. Further, it is common knowledge that Jihad is frequently misdefined as a religious war. The first level of Jihad is the struggle of an individual within himself or herself to stay on the straight path. The general concept of Jihad is to "strive in [God's] cause" as a means of being guided to the straight path. See, **Holy Koran, Surah 29: verse 69. Cf. Holy Koran, Surah 49: verse 15** (Those who "have striven with their belongings and their persons in the cause of Allah); **Surah 60: verse 1** (If ye have come out to strive in [God's] way").

names included Ahmed Elfgeeh, Abad Elfgeeh and Nabil Alruhani. Alruhani is also known as Nabil Hassen.

## 3. Abad Elfgeeh and Nabil Hassen

### (a) Abad Elfgeeh

Murphy thereafter secured the bank records of Abad Elfgeeh "and they looked suspicious." The records indicated that Elfgeeh had transferred "money all over the world, to the tune of millions of dollars." In this context, Murphy testified that Elfgeeh transferred "$22,000,000 from [an] account at J.P. Morgan Chase to multiple countries around the world."

The cooperating informant subsequently approached Abad Elfgeeh at Murphy's request. The informant utilized the subterfuge that he was seeking Elfgeeh's assistance in a money transfer. The informant was advised by Elfgeeh that he (Elfgeeh) "was not able to help out [or to] transfer money at the time because...authorities would consider the transfer of money [as] related to terrorism."

Elfgeeh allegedly further "advised the confidential informant to transfer the money [in a] similar fashion as Sheikh [Abdullah] Satar had done in the past."[4] Satar had allegedly traveled in the past with a diplomatic passport,

---

[4] Despite his refusal to be entrapped into illegal behavior, Elfgeeh was arrested and charged with operating an unlicensed money transferring operation.

thereby minimizing official scrutiny. Satar was described by Murphy as the Imam of a mosque in Yemen.

### (b) Nabil Hassen

The informant was thereafter directed by Murphy to contact Nabil Hassen. The informant spoke to Hassen in November of 2002. The conversation was surreptitiously recorded. The informant was instructed to ask Hassen "whether he would transfer money to Sheikh Al-Moayad on his behalf."

Hassen replied in the same fashion to the informant as had Elfgeeh. He informed the informant that "if he transferred money to Al-Moayad after 9-11 he would be arrested and so would the informant." In short, like Elfeegh, Hassen refused the informant's overture to become involved in a questionable money transfer.

## 4. Sheikh Abdullah Satar

In December of 1999 and January of 2000, Sheikh Abdullah Satar traveled to America to raise funds for the Charitable Society of Social Welfare (CSSW). Murphy commenced an investigation of CSSW "to determine whether its [actually] a charity [or a] front organization to funnel money to terrorists." CSSW is based in Yemen.

CSSW has several branches within the United States, including Brooklyn. The Brooklyn Chapter is legally

incorporated in the State of New York. <u>Nabil Hassen and defendant are listed in the articles of incorporation as directors of the charity.</u>

Satar entered the United States on December 28, 1999 and exited on January 1, 2000. When Satar departed from the United States, he traveled to Milan, Italy. In Italy, Satar was "met by the Imam of the Islamic Institute of Milan and was also in the company of Al Said Mahmud". Murphy testified that the Milanese Imam presides over "what the Italians told [him] is the most radical and fundamentalist Mosque of Milan." He further testified that Al Said Mahmud "was convicted of aiding and abetting a terrorist organization."

Satar allegedly gave a speech in Milan "in which he accused the United States of [investigating] a designated terrorist in order to curry favor with the Jewish population and to project hatred upon Muslims." Murphy further claimed that Satar "called upon the people that were in attendance at the Mosque to join the Jihad, which was [occurring] in Checzhnia".

During the period of his visit to the United States, Satar "spent a majority of the time with [defendant], Abad Elfgeeh [and] Nabil Hassen." The FBI at that time conducted a visual surveillance of Sheikh Satar and defendant. That

agency also electronically surveilled the cell phone, the home phone and the business phone of [defendant]".

## 5. The Interviews of Defendant

### (a) Murphy's Direct Testimony

On February 28, 2003 Murphy "went to [defendant's] home to interview him". Murphy's purpose was "to determine what [defendant] knew about Sheikh Satar trying to raise funds...for terrorism [and] what Satar had said during his speeches while in the United States". <u>Murphy informed defendant that he was investigating Satar and CSSW's involvement in terrorism.</u>

Defendant and Murphy discussed defendant's past domiciles and the duration of his residence in the United States. Defendant had resided in the United States for 18 years. He admittedly utilized the alias Rafiq Talaba on occasion. Defendant further advised Murphy that "he currently owned and operated two gas stations...and at least one business in Far Rockaway."

In response to a specific inquiry, defendant stated to Murphy that Satar to his knowledge had neither "advocated [religious war] in any form" during speeches nor attempted to raise money for terrorist causes. Defendant informed Murphy that Satar was involved in fundraising only for CSSW. Defendant further stated that Satar "was very well

known in Yemen [and] a member of Parliament." Defendant "advised [Murphy] that he first met Sheikh Satar four to five years ago when Satar came to the United States."

Murphy testified that defendant indicated that "he didn't know [Satar] on a personal basis and spent little time with him [and] really had no interaction with him", Defendant admitted providing transportation to Satar on occasion "as a mere coincidence." Defendant denied raising and/or holding money for Satar, or allowing Satar to utilize his cell phone.

Murphy inquired of defendant as to his involvement in money transfers for Satar; any relationship or familiarity with Abad Elfgeeh; and, whether he had transported Satar to Elfgeeh's business establishment. Defendant denied participation in money transfers; admitted to a minimal familiarity with Elfgeeh, and denied transporting Satar to visit Elfeegh. Defendant admitted knowledge that Elfeegh was a money remitter but was unaware of his arrest. Defendant also denied awareness of any efforts by Nabil Hassen to raise money on behalf of Satar.[5]

Murphy interviewed defendant a second time on March 4, 2003. This interview was conducted by telephone.

---

[5] It was stipulated that defendant wrote a check to Elfeegh for $3,000, which was dated January 23, 1999.

Unbeknownst to defendant, Murphy recorded the conversation. Murphy stated to defendant that [he] had written a report based on [their] last conversation and wanted to confirm the facts...to make sure that [he] was being accurate." Murphy testified that there were "a lot of differences" between the first and second interviews. He stated:

> During the first conversation, the unrecorded one, [defendant] answered most of the questions with yes or no answers, he seemed a lot more positive about his answers. He often said I [am] very sure about that, and during the recorded conversation to the same questions he would say I don't remember.

Murphy arrested defendant "approximately a month later".

### (b) Cross-Examination of Murphy

On cross-examination Murphy conceded his understanding that Satar's visit to the United States coincided with the Month of Ramadan. Muslims are encouraged to contribute generously to charities during that month. Murphy further admitted that no evidence exists that defendant had any contact or familiarity with Sheikh Mohammed Al-Moayad.[6].

Murphy testified that the parent entity CSSW had not been designated as a terrorist organization during the

---

[6] Al-Moayad is the person made reference to in the trial who was arrested for alleged terrorist-related conduct. It is significant that defendant had no contact or familiarity with him.

period of Satar's visit to the United States. <u>Similarly, the New York branch had no such designation and was a valid New York charitable organization.</u> Indeed, there were "no red flags that [indicated] don't donate to CSSW." So too, at the time of trial in 2004 CSSW was still legally viewed as a valid charitable organization.

In the second tape-recorded interview, defendant informed Murphy that he transported Satar to various Mosques and "sometimes [Satar was involved in] fundraising." In that second interview, with respect to Satar's usage of defendant's cell phone, defendant replied "I don't remember, but he could have used it." Defendant iterated in the recorded conversation that he "didn't help [Satar] collect any donations." And, defendant maintained the position that he did not "pick up any money or carry any money for Satar."[7].

### iii. Visual Surveillances of Defendant

**a. Jeffery Carrie**

---

[7] On redirect examination Murphy was permitted to testify to his belief that truthful information from [defendant] would substantially advance [his] investigation into whether or not Sheikh Satar was involved in terrorist activities." Murphy further testified to a personal belief that "truthful information from [defendant] would have substantially advanced the investigation with CSSW", and "that [defendant]...possessed information...that was valuable for [his] terrorist investigation". Defense counsel's objection to the final component of the line of questioning was overruled.

Carrie is employed as a supervisory agent with the Federal Bureau of Investigation. In December of 1999 he was assigned to Squad SO-13. That squad is involved in "Special Operations". SO-13 provided "covert surveillance in support of the case squads."

In December of 1999, Carrie's squad was assigned "to follow [defendant]". A "24 hour surveillance of [defendant] was conducted at that time" by Carrie and the Special Operations squads. Three teams of agents were assigned eight hour shifts to effect the surveillance. Carrie testified concerning pertinent observations preserved in surveillance logs. These observations are detailed below.

**1. December 29, 1999**

Defendant departed his residence shortly after 10:14 a.m. and traveled to the Canarsie Mosque. At 10:51 a.m. he departed from that mosque with Satar. They traveled to the Carnival Ice Cream Store (Elfeegh's business). "Satar exited the vehicle and went inside and [defendant] remained in the vehicle." According to Carrie, Satar "exited that location carrying a piece of paper about four inches by six inches in size."

Defendant and Satar thereafter traveled to the area of the French Consulate in Manhattan. Carrie testified that defendant entered the consulate "approximately three times

and each time he exited [defendant] had some document with him...and showed them to Sheikh Satar." Defendant and Satar subsequently traveled to the Dawood Mosque in Brooklyn.

## 2. December 30, 1999[8]

At approximately 1:04 p.m. defendant, Satar and three other individuals entered defendant's vehicle and departed from the area of the Dawood Mosque in Brooklyn. The vehicle stopped at the Al-Noor Boutique. Satar entered that location and returned to the vehicle within three minutes. Thereafter, defendant and Satar entered the premises of "Yemenia Airways for a period of 2 minutes, and subsequently entered the Young World Department store for 14 minutes."

Defendant and Satar visited the New Star Tobacco Store (Nabil Hassen's business) for 17 minutes and concluded their joint activities, as recorded by Carrie, at the Al-Forooq Mosque on Atlantic Avenue in Brooklyn at 2:16 p.m. Carrie identified photographs which corroborated the information set forth in the surveillance logs.

### b. Gregory Massa

Massa is a special agent employed with the Federal Bureau of Investigation. In December of 1999, Massa was

---

[8] The focus of the surveillance shifted from defendant to Satar.

assigned to Squad SO-2. He participated in the surveillance of defendant. He testified concerning his observations.

**1. December 28, 1999**

At 8:00 a.m. defendant and "several [unidentified] others" traveled in defendant's vehicle to Newark International Airport. Defendant and the others exited the vehicle and greeted Sheikh Satar. Satar thereafter accompanied defendant and the others to defendant's vehicle. Satar's luggage was placed therein and the group deported from the airport.

**2. December 29, 1999**

At 3:22 p.m. defendant and Satar entered defendant's motor vehicle. They traveled to the French Consulate. Defendant entered the consulate for a period of a few minutes, exited and returned to the vehicle. At 4:45 p.m. both defendant and Satar entered 5308 Arverne Boulevard in Queens. They departed within 15 minutes and traveled to defendant's residence.

At 6:22 p.m. defendant, Satar and others exited the residence and traveled to the vicinity of the Al-Farooq Mosque. At 9:35 p.m. they exited the mosque and conversed with several unidentified individuals.

**3. December 30, 1999**

At 3:37 p.m. defendant and Satar exited the Al-Farooq Mosque in Brooklyn. They traveled to Oriental Pastry and thereafter to Yemenia Airways. At 4:29 p.m. defendant and Satar returned to defendant's residence. At 6:19 p.m. defendant, Satar and others exited the residence and traveled to 5308 Arverne Boulevard. At 6:36 p.m. they proceeded to the Islamic Society of Bay Ridge. At 9:00 p.m. Satar and defendant exited the mosque and departed from the area in separate vehicles.

### 4. December 31, 1999

Defendant and Satar entered the Institute of Islam at 2:28 p.m. They exited at 2:43 p.m. and traveled to the Yemenia Travel Agency. At 3:00 p.m. they proceeded to and entered the Carnival Ice Cream Store (Elfeegh's business). At 4:07 p.m. defendant departed from the area unaccompanied by Satar.[9].

### c. Wylie Borum

Borum has been employed by the FBI for 13 years. In December of 1999, he was assigned to "Special Operations 13". Borum participated in the surveillances of defendant and Satar.

### 1. January 1, 2000

---

[9] Massa was constrained to admit on cross-examination that he observed at least two other persons provide transportation to Satar.

At 9:47 a.m. defendant arrived at the Canarsie Islamic Services Center. "Two minutes later, he came out the door with Satar." They thereafter traveled to the New Star Tobacco Store where they remained for "about half an hour or so and left and drove back to Canarsie." Defendant and Satar entered the Carnarsie Center "for about an hour and a half" and then [drove] to [defendant's] residence in Far Rockaway, Queens."

## d. Frank Cultera

In December 1999 Cultera was assigned to "Special Operations 13". He too participated in the surveillance of defendant.

### 1. December 29, 1999

At 12:15 p.m. Cultera followed defendant and Satar to Manhattan. Defendant entered and exited 10 East 74th Street several times. During this process, defendant and Satar appeared to examine various documents inside defendant's motor vehicle. They thereafter left and traveled to 143 State Street in Brooklyn. At 2:13 p.m. Satar and defendant entered the premises.

### 2. December 30, 1999

At 11:42 a.m. defendant was followed to an Islamic religious facility in Canarsie. Satar exited the facility and entered defendant's vehicle. At 12:19 p.m. Satar exited

defendant's vehicle and entered the premises located at 143 State Street in Brooklyn. At 1:22 p.m. Satar exited the State Street premises and rejoined defendant.

### e. Robert Moulder

Moulder has been employed by the Federal Bureau of Investigation for 20 years. In December of 1999 Moulder was assigned to "Special Operations 13." He participated in surveillances during the applicable time period. However, he did not identify either Satar or defendant. Indeed, Moulder stated "I don't know who [defendant] is to be honest with you." Logs prepared by Moulder described defendant as a "UMEM". That acronym means "unknown middle eastern male".

### f. Kenneth Pietrzak

Pietrzak is employed by the Federal Bureau of Investigation. In December of 1999 he was assigned to "Special Operations 2." His squad was assigned "to surveil (defendant)". Pietrzak was in the same squad as Massa. His observations essentially corroborated those of Massa. However, Pietrzak provided individual observations respecting January 1, 2000.

### 1. January 1, 2000

Pietrzak commenced his shift outside defendant's residence in Far Rockaway at approximately 2:30 p.m. At

3:20 p.m. defendant, Satar and others exited defendant's residence. They traveled to Kennedy International Airport to the Delta Airlines area located at Terminal Three. Defendant, Satar "and a small child" entered the Terminal.[10]

### iv. Electronic Surveillances

The United States adduced several recorded telephone conversations intercepted pursuant to an electronic surveillance order. The pertinent conversations are detailed below seriatim and synopsized. Transcripts of the conversations were read to the jury.

**1. December 29, 1999 (10:36 a.m.)**

This conversation involved defendant and Abad Elfeegh. Defendant advises Elfeegh of Satar's arrival in the United States. There is also a discussion relative to a visa and the necessity of visiting an embassy. Defendant further states "we will stop by in a little while".

**2. December 29, 1999 (5:18 p.m.)**

An unknown male places a call to defendant's cell phone and requests to speak with Satar. Airlines tickets from New York to Rome, Italy, and from Rome to Milan are discussed.

---

[10] Agent Peter Marinara was stationed inside the Terminal. He observed Satar board Flight 148 with an intended destination of Rome, Italy.

**3. Defendant, Mohammed Al-Arabi and Ahmed Al-Nima**

Defendant places a call to the Islamic Center of Jersey City. He requests to speak with Sheikh Abed Rab Al-Nabi. That individual is not present and defendant modifies his request to speak with Mohammed Al-Arabi. During the interim, defendant appears in a side conversation to advise Satar about fundraising methodology. He stated:

> Sheikh Abdullah, if at Al-Forooq, we will tell them that we still have 20 families, who's going to sponsor them? 20 families at $7,000, that is not bad. Talk to Sheikh Mungi, tell him we have 20 families, can they sponsor them.

Thereafter, defendant discusses the arrangements for Satar's planned appearance at the Islamic Center of Jersey City and other contemplated fundraising appearances. The discussion also incorporated issues relative to Satar's availability to present a Friday sermon.

**4. December 30, 1999**

Defendant and an unidentified male discuss defendant's commitment to meet Satar and Satar's travel plans.

**5. December 30, 1999**

Defendant is with Satar and he discusses with Nabil Hassen "the committee for collecting donations from the people". It is decided that Hassen will "give him five checks". The intention was that one check would be cashed

each month. Hassen requests a meeting and defendant replied "I am busy with the Sheikh".[11]

**6. December 31, 1999 (2:19 p.m. and 11:00 p.m.)**

Defendant and an unidentified male discuss alleged instructions from Satar to "collect the money for the Islah and give it to Hizam and Abad". A meeting relative to this issue is planned. In a second conversation defendant and Satar discuss fundraising.[12]

**7. January 1, 2000 (1:27 p.m.)**

On defendant's cell phone Satar and Ahmed discuss charitable donations in the form of "gold plates or rings or things like that". A decision is made to sell the items in America because the prices are higher.[13]

**8. January 11, 2000 (10:14 a.m.)**

Defendant contacts Satar in Germany by telephone. He informs Satar of the intended disposition of "$1,500 and an

---

[11] That same day a call is placed to defendant's cell phone by Abu Emad who requests to speak with Satar. The conversation relates to travel to Italy. Thereafter, defendant discusses the travel issue with Hizam in a separate conversation. Defendant also states "the people that gave the money, I also have money and it is from the Sheikh himself." Hizam also makes reference to cashing checks "written in the name of the society, CSSW."

[12] On January 1, 2000 defendant speaks with Abu Emad and advises him that Satar will arrive in Rome "at about 8:30". He also speaks to Dr. Hammoud "regarding the $20,000". Satar and Hammoud also speak personally.

[13] On January 3, 2000 defendant has a conversation with Abad Elfeegh and Hizam Alsaydi. Defendant stated that "the Sheikh left $1,500 with me."

additional $1,000 approximately for money Zakat and fasting Zakat." Defendant stated:

> The money Zakat will be given to the mosque and the fasting Zakat, we will distribute it to the poor here and whatever is left we'll send it to you.

They also discuss Nabil Hassen and checks to written "in [his] name or the names of the three". Defendant concluded the conversation with the statement that Hassen would contact Satar.

**B. The Defense**

The defense consisted exclusively of a reading of a more detailed and complete version of the transcripts of several of the conversations adduced earlier by the United States. Defendant opted not to testify in his defense.

On the basis of the foregoing proofs, defendant has convicted of uttering false statements and sentenced to a term of five years imprisonment.

Defendant appealed the sentence. The Second Circuit remanded.

<u>**Legal Argument**</u>

<u>**Point I**</u>
**The Sentence Imposed Is Unreasonable
and Excessive and Must Be Reduced**

The instant matter was remanded for a determination whether United States v. Crosby, 397 F.3d 103 (2 Cir.

2005), requires a resentencing. The specific purpose of the remand is resolution of an issue concerning the post-Booker/Fanfan correctness of the sentencing procedure utilized herein. The decision in Crosby sets forth guidelines "to afford the judge the opportunity to determine whether the original sentence would have been nontrivially different under the post-Booker/Fanfan regime." United States v. Crosby, supra at 119. This Court imposed a non-guideline sentence based upon a finding that the Guidelines are unconstitutional. The present state of the law is that the constitutionality of the Guidelines is preserved by restricting them to advisory as opposed to mandatory consideration.

Post-**Booker/Fanfan**, "the sentencing judge s entitled to find all the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." **United States v. Crosby, supra at 112.** However, it is a violation of the Sixth Amendment to make factual findings and mandatorily enhance a sentence above the range

applicable to facts found by a jury. **Id at 114.**[14] The **Crosby** Court stated further:

> Thus, at this point, we can identify several essential aspects of **Booker/Fanfan** that concern the selection of sentences. First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in **section 3553(a)**. Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in **section 3553(a),** whether (I) to impose the sentence the would have been imposed under the Guidelines, *i.e.*, a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence. **[397 F.3d supra at 113]**

We submit that the 5-year period of imprisonment imposed by this Court violates "the now applicable standard of reasonableness." **United States v. Crosby, supra at 114.** This Court committed an error of law in the course of

---

[14] The **Crosby** Court stated that it is also error to mandatorily apply the applicable Guidelines range that was based solely on facts found by the jury. **Id.**

exercising its discretion to impose a non-guidelines sentence. Specifically, this Court did not consider all of the factors set forth in **§ 3553(a)**. Adequate consideration of defendant's personal history as is required by the statute would have resulted in a sentence less than the 5 year maximum. Or, stated somewhat differently, consideration of those factors should result in a lesser sentence.

### i. Background

### 1. The Indictment and Statements

Defendant was charged exclusively with a violation of **18 U.S.C.A. § 1001.** The indictment averred that defendant "did knowingly and willfully make materially false, fictitious and fraudulent statements and representations in a matter within the jurisdiction of executive branch". The indictment stated further:

> [Defendant] stated [to an FBI agent] that he was no way involved with and did not help with the fundraising activities of John Doe...when in fact, as he then and there well knew and believed, he had assisted John Doe in connection with fundraising activities by:(1) driving John Doe to various locations knowing that John Doe was engaged in fundraising activities; (2) advising John Doe on the content of fundraising speeches; (3) arranging the remission of funds collected by John Doe, and (4) holding money and valuables for John Doe.

The proofs at trial established that the John Doe set forth in the indictment is Sheikh Abdullah Satar.

The indictment as described to the jury makes no reference to alleged terrorist activity and/or defendant's awareness of it. The indictment specifically relates to an FBI investigation wherein agent Brian Murphy approached defendant to discuss Satar's activities in New York in late December of 1999 and early January of 2000. <u>As a predicate to the questioning, the United States alleged that Murphy informed defendant that he was investigating Satar and CSSW's involvement in the financing of terrorism.</u>

At the outset, we are constrained to concede that acceptance of Murphy's version of the two interviews of defendant establishes the utterance of answers to inquires in variance with unrefuted electronic and visual surveillance. The knowing and willful nature of the statements as well as the question of materiality were resolved against defendant at trial. This court thereafter imposed the statutory maximum five year period of imprisonment on defendant.

## 2. The Guidelines Calculation

Defendant had no prior record and was in a guideline range of zero to six months prior to the United States'

request that the probation department and the district court apply **U.S.S.G. § 3A1.4** to the instant matter. The guideline relied upon by the United States states:

**<u>Terrorism</u>**

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by **12 levels;** but if the resulting offense level is less than level **32**, increase to level **32.**

> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

The guideline clearly does not on its face apply to a violation of **18 U.S.C.A. § 1001.** The statute in question does not proscribe a federal crime of terrorism as is referenced in the guideline. <u>Further, there was no proof adduced at trial that defendant intended to promote a federal crime of terrorism.</u> However, **Application Note (2) (B)** states that obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism. <u>In short, the guideline assumes a fact neither charged in the indictment nor proved at trial.</u> Application of the guideline based on that note herein acts to increase

defendant's offense level to 32 and criminal history category to category VI.

Specifically, the affect of the guideline in this case would be to raise the base offense level from a level 6 to a total offense level of 32 and the criminal history category from I to VI. Accordingly, the guidelines applicable in that circumstance effect an enhancement of the sentence from 0-6 months to 210 to 262 months.

The United States specifically argued to the this Court that defendant obstructed the federal crime of terrorism set forth in **18 U.S.C.A. § 2339 (b).** That particular statute proscribes the providing of material support to a designated foreign terrorist organization. In support of its view, the United States Attorney stated:

> [Defendant's] lies to the agents about the fund-raising activity of the Sheikh directly impacted and obstructed the agents' investigations into Satar's fundraising activities, and the possibility that those monies were going directly to Al-Qaeda, as well as their investigation into Al-Moayad and his support of Al-Qaeda and Hamas...the agents, when interviewing [defendant], expressly advised him that they were investigating whether or not Satar, during that fundraising trip, was financing terrorism.

This Court adopted the United States' argument and ruled that the guideline was applicable herein. This Court

stated that defendant's conduct obstructed an investigation of the federal crimes of terrorism set forth in **18 U.S.C.A. § 2339 (b)** (material support), and **18 U.S.C.A. § 2339 (c)** (financing). In this context, this Court stated:

> The issue, then, is not that the government, as [defense counsel] argued, must prove, in a false-statement case, the defendant is guilty of the crime of terrorism that becomes applicable under the Guidelines, but rather that he obstructed an investigation into a federal crime of terrorism.

This Court stated that it found the existence of the factual predicate for application of the guideline beyond a reasonable doubt. This Court stated:

> The proof here is overwhelming that [defendant] knew that he was lying about facts relevant to an investigation of a federal crime of terrorism. He knew he was doing so, because the agents told him so, and there's no indication of any dispute with regard to that.

It bears repeating that the sentence herein was enhanced from probation to 5 years imprisonment on the basis that defendant's utterance of false statements obstructed a federal terrorism investigation. <u>Obstruction of such an investigation was not an element or any offense charged in the indictment and/or presented to the jury for its consideration as to defendant's guilt or innocence.</u>

Moreover, at present, there is no evidence indicating that defendant was aware of so-called terrorist conduct on the part of any person or entity. Further, CSSW was not designated as a terrorist organization before, during, or after trial.

The defendant in **Blakely v. Washington, 124 S.Ct. 2531 (2004),** received an unexpected increase of three years in his sentence. The sentencing court justified the sentence on the basis that the petitioner had acted with "deliberate cruelty". That phrase is set forth as a statutorily enumerated ground for departure in domestic violence cases in the State of Washington's sentencing scheme. **124 S.Ct. supra. at 2535.** The petitioner in **Washington** appealed, arguing that the sentencing procedure deprived him of his federal constitutional right to have a jury determine beyond a reasonable doubt all facts legally essential to his sentence. **Id.**

The United States Supreme Court in **Blakely** applied the rule of **Apprendi v. New Jersey, 530 U.S. 466, 490 (2000),** and condemned the sentence. The Court in **Blakely** stated that the statutory maximum for **Apprendi** purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. In other words, the relevant statutory maximum

is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. **Blakely v. Washington, 124 S.Ct. supra. at 2537.**

Defendant in the instant case had no prior record and was not subject to any role adjustments. The properly applicable guidelines in that context indicated that the appropriate sentence was zero to six months imprisonment. Simply put, the maximum applicable sentence under the guidelines was six months. <u>This Court on its own found the additional fact of "obstruction" and increased the maximum sentence of imprisonment 10 fold to sixty months.</u> We stress that the jury was not required to consider any concept of obstruction in its deliberations. It cannot be gainsaid that **Blakely v. Washington, supra,** renders this result unconstitutional.

The Court in **Blakely** stated that "Just as suffrage ensures the people's ultimate control in the legislative and executive branches, **jury trial** is meant to ensure their control in the judiciary." **124 S.Ct. supra at 2539.** Stated somewhat differently, the jury "is not relegated to making a determination that the defendant at some point did something wrong, a mere preliminary to a judicial

inquisition into facts of the crime [the prosecutor] actually seeks to punish". **Id.**

The very reason the Framers put a jury-trial guarantee in the Constitution is that they were unwilling to trust government to mark out the role of the jury. **Id. at 2540.** And, we iterate that "every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment". **Blakely v. Washington, 124 S.Ct. supra at 2543.** So too, "there is not one shred of doubt...about the Framer's paradigm for criminal justice...the common-law ideal of limited state power accomplished by strict division of authority between judge and jury". **Id.**

Defendant was clearly sentenced to prison for at least 4 1/2 years beyond what the law/guidelines allowed for the crime of which he was convicted, on the basis of a disputed finding that he **obstructed** a terrorism investigation. "The Framers would not have thought it was too much to demand that, before depriving [a man of 4 1/2 more years] of his liberty, the prosecutor should suffer the modest inconvenience of submitting its accusation to the unanimous suffrage of twelve of his equals and neighbors, rather than a lone employee of the [United States]". **Blakely v.**

**Washington, 124 S.Ct. Supra at 2543.** Application of the guidelines herein is unfair and a violation of due process.

## B. The Non-Guidelines Sentence Was Clearly Excessive

This Court also imposed a non-guidelines sentence "assuming that the enhancement is unconstitutional under **Blakely**". This Court stated that "the remedy is to...sentence [defendant] between the statutory minimum and the statutory maximum". Accordingly, this Court indicated that it could properly consider all relevant information pursuant to **18 U.S.C.A. § 3661** "and all of the various sentencing statutes which are not of the Guidelines regime".

In imposing the statutory maximum, this Court stated:

> The defendant knew that the investigation as to which he was willfully lying to the FBI related to terrorism and specifically the financing of terrorism. The crime of making false statements covers a wide range of conduct, some of it far less serious, indeed, most of it far less serious, that what happened in this case. Under all the circumstances, the statutory maximum for false statements is appropriate in this case.

This Court referenced **18 U.S.C.A. § 3661** as a statutory basis for information gathering. The statute states:

> No limitation shall be placed on the information concerning the background,

> character, and conduct of a person convicted of an offense which a court may receive and consider for the purpose of imposing an appropriate sentence.

This Court misconstrued the statute. It encourages consideration of all relevant information as opposed to a narrow focus such as the sentencing basis utilized. This Court's reasons for its sentence consisted only of the fact that defendant uttered false statements to an FBI agent involved in a terrorism investigation. <u>According to this Court, that fact alone required imposition of the statutory maximum.</u> This Court disregarded defendant's unblemished record; stable family circumstances and responsibilities, and history of substantial lawful gainful employment.

<u>More importantly, this Court ignored the fact that defendant has at no time been linked to terrorist activity or the knowledge of it.</u> As is set forth above, it simply cannot be the law that the conduct herein merits imposition of the most severe sentence allowable within the statutory maximum. See, **United States v. Bowman, 926 F.2d 380 (4 Cir. 1991).**

Indeed, this Court fatally erred when it failed at a minimum to consider "the history and characteristics of the defendant" as is required within **18 U.S.C.A. § 3553.** See, **United States v. Amato, 15 F.3d. 230, 237 (2 Cir. 1994).** (A

defendant has a statutory right to an individualized sentence). It is submitted that this Court has no option other to fashion a lesser sentence which comports with due process. See, **United States v. Mourning, 914 F.2d 699 (5 Cir. 1990).**

## Conclusion

For the foregoing reasons, we respectfully submit that this Court must reduce the sentence imposed herein. Fundamental fairness and due process demands no less. The composite result herein is a hollow mockery of justice.


Respectfully submitted,



Alan Dexter Bowman
Attorney for Defendant


Alan Dexter Bowman
Of Counsel and on the Brief

# Table of Contents

Statement of the Case ....................................... 1

A. The United States' Proofs ........................... 1

I. The Investigation At Issue ......................... 1

i. Background ....................................... 1

a. Brian Murphy .................................. 1

ii. The So-Called Black Bear Investigation ........... 4

1. The Regional Focus ............................ 4

2. Sheikh Mohamed Al-Moayad ....................... 5

3. Abad Elfgeeh and Nabil Hassen .................. 7

(a) Abad Elfgeeh.................................. 7

(b) Nabil Hassen................................. 8

4. Sheikh Abdullah Satar .......................... 8

5. The Interviews of Defendant ................... 10

(a) Murphy's Direct Testimony.................... 10

(b) Cross-Examination of Murphy................. 12

iii. Visual Surveillances of Defendant ............. 13

a. Jeffery Carrie ................................ 13

1. December 29, 1999............................. 14

2. December 30, 1999............................. 15

b. Gregory Massa ................................. 15

1. December 28, 1999............................. 16

2. December 29, 1999............................. 16

3. December 30, 1999............................. 16

4. December 31, 1999.............................17

   c. Wylie Borum ...................................17

     1. January 1, 2000.............................17

   d. Frank Cultera ................................18

     1. December 29, 1999...........................18

     2. December 30, 1999...........................18

   e. Robert Moulder ...............................19

   f. Kenneth Pietrzak ............................19

     1. January 1, 2000.............................19

Legal Argument ........................................23

  Point I
  The Sentence Imposed Is Unreasonable
  and Excessive and Must Be Reduced ....................23

   i. Background ......................................26

    1. The Indictment and Statements .................26

    2. The Guidelines Calculation ....................27

  B. The Non-Guidelines Sentence Was Clearly Excessive..34

Conclusion ............................................36

## Table of Cases

Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) .........32

Blakely v. Washington, 124 S.Ct. supra at 2543 .......33, 34

Blakely v. Washington, 124 S.Ct. supra. at 2537 ..........32

United States v. Amato, 15 F.3d. 230, 237 (2 Cir. 1994) ..36

United States v. Bowman, 926 F.2d 380 (4 Cir. 1991) ......36

# Table of Other Authorities

18 U.S.C.A. § 1001 ................................ 1, 26, 28

18 U.S.C.A. § 2339 (b) ............................... 29, 30

18 U.S.C.A. § 2339 (c) ................................... 30

18 U.S.C.A. § 3553 ...................................... 36

18 U.S.C.A. § 3661 ...................................... 35